IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

GREG HARGUS,                                    )
                                                )
                    Plaintiff,                  )
                                                )
vs.                                             )
                                                )
FEROCIOUS AND IMPETUOUS, LLC                    )          Civil No. 2013-111
d/b/a ONE LOVE CHARTERS, KYLE                   )
COLEMAN, JOSEPH TRATTNER, the ST.               )
THOMAS SPORT AND SOCIAL CLUB,                   )
LLC and the M/V ONE LOVE, a twenty-six          )
(26) foot 1998 Stamas CC, bearing U.S.          )
Virgin Islands Vessel Registration Number:      )
VI 3333-TC, with twin Yamaha 150                )
horsepower engines and her apparel,             )
appurtenances, etc., *in rem*,                  )
                                                )
                    Defendants.                 )
_____ )

**<u>MEMORANDUM OPINION</u>**

This admiralty action arises out of injuries plaintiff suffered during a May 19, 2012 boating excursion when the boat captain threw an object at and struck plaintiff in the head ("the May 2012 incident"). A bench trial was held on February 24, 2015 and February 25, 2015.[1] Following the trial the parties submitted proposed findings of fact and conclusions of law to the Court. [DEs243, 248]. The Court, having fully considered the testimonial and documentary evidence presented and admitted at trial, the arguments of counsel and the applicable law, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

---

[1]      *See* Feb. 24, 2015 Trial Tr. ("T1") [DE 232] and Feb. 25, 2015 Trial Tr. ("T2") [DE 233].

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 2

# I.      FINDINGS OF FACT

**A.      The Parties**

1.      Greg Hargus is a resident of St. Thomas, U.S. Virgin Islands.

2.      Ferocious and Impetuous, LLC d/b/a One Love Charters ("One Love") is a limited liability company operating on St. Thomas, U.S. Virgin Islands, which provides boat rentals to individuals and groups.

3.      Joseph Trattner and Brent Hazzard organized One Love in November 2011, and were co-managing members.

4.      Joseph Trattner is currently the sole managing member of One Love.

5.      One Love owns the vessel M/V One Love ("the Vessel").

6.      Kyle Coleman is a former boat captain who, during the relevant time period, captained boats for One Love and for other companies.

**B.      The Operation of One Love and its Association with Coleman**

7.      Operators of the Vessel were limited to individuals selected by One Love and approved by One Love's insurer.

8.      In November 2011, Coleman captained a parasailing vessel that was involved in an accident that resulted in the death of one passenger and injuries to another passenger (the "parasailing incident").

9.      In December 2011, One Love asked its insurance carrier to add Coleman as an operator of the Vessel.

10.      When One Love first requested approval of Coleman as an authorized operator in December 2011, Coleman did not possess a valid captain's license and Trattner was aware of Coleman's involvement in the parasailing incident.

11.      The form One Love submitted to its insurer seeking approval of Coleman as an operator did not list the parasailing incident as a "loss."

12.      Before One Love used Coleman as a captain, One Love did not ask Coleman about his prior driving or boating record, conduct any kind of sea trial, or perform a background check on him.

13.      At the time of the May 2012 incident, Coleman held a valid 100 ton captain's license, which had been issued to him on December 20, 2011.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 3

14.    No criminal charges were pending against Coleman concerning the parasailing incident either at the time Coleman began acting as a captain for the Vessel or at the time of the May 2012 incident.

15.    While a captain is out on the Vessel, One Love does not have any involvement with or control over the captain.

16.    At the conclusion of trips for One Love, Coleman was responsible for collecting the boat rental, fuel cost and captain's fees from all passengers. Coleman also was responsible for refueling the Vessel and removing any trash from it and scrubbing it down.

17.    Boat rentals could be paid on a credit card but the captain had to receive his pay in cash from the passengers. If a trip included six passengers or fewer, One Love paid the captain by check.

**C.    The May 2012 Incident**

18.    On May 19, 2012, a group of individuals rented the Vessel from One Love to travel to various places throughout the U.S. Virgin Islands.

19.    Coleman captained the Vessel.

20.    Coleman had the passengers sign a "waiver" prior to departure.

21.    That afternoon, Coleman anchored the Vessel in Cruz Bay, St. John.

22.    While in Cruz Bay, Coleman, who was standing on the beach about 25 feet from the anchored Vessel, witnessed two passengers on the beach throwing beer cans at plaintiff, who remained on the Vessel.

23.    Coleman joined them and threw an empty plastic insulated coffee cup at plaintiff.[2]

24.    The coffee cup hit plaintiff's temple on the left side of his head.

25.    No passenger, including plaintiff, reported an injury, nor did anyone express concern for plaintiff's wellbeing.

26.    At the conclusion of the charter, Coleman collected the boat rental, fuel and captain's fees from all passengers, including plaintiff. Coleman also removed any debris from the Vessel and scrubbed it down.

27.    After being struck, plaintiff was in pain, and he experienced headaches and vision problems, including while driving home.

28.    Plaintiff did not lose consciousness.

---

[2]    Coleman testified "[t]here was no malicious intent.  I wasn't trying to hurt him or even hit him," but rather was "just getting his attention."  He also testified that he was aiming for the boat.  T1 223-25.

### D.    Plaintiff's Medical Diagnosis and Treatment

29.    Prior to the May 2012 incident, plaintiff had a history of 10 to 12 prior head injuries or concussions.

30.    Plaintiff sought medical treatment from Mark Livingston, M.D., on May 21, 2012.

31.    Dr. Livingston noted plaintiff's history of previous concussions and he performed a "focused neurological exam" that yielded "normal" results.

32.    Dr. Livingston diagnosed plaintiff with a contusion and a mild concussion with no loss of consciousness. He found no obvious signs of physical injury and did not prescribe any medication.  He authorized plaintiff to return to work that day without any restrictions.

33.    Although suffering from headaches, some of which he described as "massive," and experiencing memory issues and moodiness for some months, plaintiff did not seek additional medical treatment for his head injury until thirteen months later.

34.    James Nelson, M.D., an expert in the fields of Neurology and Internal Medicine, saw plaintiff on June 25, 2013, for complaints of headaches, mood swings and neck pain.

35.    Dr. Nelson performed an electromyogram ("EMG"), which revealed a pinched nerve in the neck.

36.    Dr. Nelson prescribed plaintiff Fioricet for his headaches and physical therapy for his neck.

37.    Dr. Nelson performed an EEG on plaintiff on July 1, 2013, which showed "localized slowing in the left temple area."

38.    Carolyn Jones, M.D., a family physician who has treated plaintiff since 2009, saw plaintiff for the first time after the May 2012 incident on August 22, 2013, for a "chief complaint of  headaches," which "presents quickly if hot and with mild[] dehydration."

39.    Dr. Jones saw no physical signs of head injury, and diagnosed plaintiff as having headaches, head injury and memory loss.

40.    Dr. Jones referred plaintiff to Insight Psychological Services, LLC ("Insight") for neuropsychological testing.

41.    Dr. Jones ordered an MRI, which came back negative.

42.    On September 26, 2013, plaintiff saw Dr. Nelson for a third and last time.

43.    Dr. Nelson referred plaintiff to Insight for a Cognistat evaluation.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 5

44. On October 3, 2013, plaintiff saw Kirstyn Livingston, a mental health therapist with Insight, for a Cognistat and Attention Deficit Hyperactivity Disorder ("ADHD") evaluation, and various psychological assessments.

45. Plaintiff's cognistat scores fell in the "average range," except memory which showed "mild impairment;" however, it was not possible to determine when plaintiff's symptoms began.

46. Other testing indicated it was "likely [plaintiff] had ADD or ADHD."

47. Ms. Livingston recommended "additional neurological testing and followup . . . and psychotherapy."

48. When plaintiff again saw Dr. Jones in October 2013, she recommended that plaintiff receive "aggressive neuro-psych therapy," and that he consider further evaluation.

49. Dr. Jones does not know the cause of plaintiff's complaints.

50. Plaintiff has not undergone further evaluation as recommended by Drs. Nelson or Jones.[3]

**E.    Plaintiff's Employment History:  2008-2014**

51. Plaintiff was self-employed (as a welder in years 2008, 2009 and 2011, and as a farmer in 2010) for the years 2008 through 2011. His tax returns for this time period indicate an average net loss of $4,740.14 from these occupations.

52. In 2012, plaintiff was employed by V.I. Ecotours doing maintenance and tours and had gross earnings of $10,663.72.  He also had miscellaneous income in the amount of $1500.00.

53. Plaintiff terminated his employment with V.I. Ecotours "around January" 2013.

54. Since early 2013, plaintiff has performed the occasional welding job, and he still owns equipment for welding.

55. Plaintiff earned "very little" in 2013, and "maybe" $300.00 in 2014.

56. Plaintiff is presently unemployed.

57. Plaintiff has training and skills in the fields of carpentry, electrical, plumbing, construction, and automotive and heavy equipment mechanics.

---

[3]     Plaintiff testified that he continues to experience headaches "at least five or six days a week" and that the pain ranges in severity from "mild . . . to a full blown pound migraine."  According to plaintiff, he did not experience headaches prior to the incident.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 6

## F.  Medical Treatment Costs[4]

58.    According to Dr. Nelson, plaintiff has a chronic condition requiring the following future
medical care:

    a.  "[A] more thorough neuropsychological evaluation" and "ongoing"
cognitive  behavioral therapy once per week at $100 per session;"
    b.  Physical therapy for two consecutive months at three times a week on a
yearly  basis for an indefinite number of years;
    c.  Follow-up treatments with a neurologist "approximately every three months"
for  an "indefinite" period of time; and
    d.  An annual EEG.

59.    Dr. Nelson charges $500 and $200 for an EEG and office visit, respectively.

## II.    DISCUSSION

Plaintiff's amended complaint alleges the following causes of action: (1) maritime lien

against the Vessel; (2) direct negligence against One Love and Trattner; (3) negligent

entrustment against One Love and Trattner; (4) negligence against Coleman; (5) vicarious  liability

against One Love and Trattner.[5]

## A.    Negligence against Coleman (Count IV)

The elements of maritime negligence are essentially the same as those for common law

negligence. *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001)

(explaining "common-law duties of care . . . have been adjusted to fit their maritime context");

*Frescati Shipping Co. v. Citgo Asphalt Ref. Co.*, 718 F.3d 184, 207 (3d Cir. 2013) ("Negligence

in admiralty law is essentially coextensive with its common law counterpart . . . ."); *Galentine v.*

---

[4]     Plaintiff offered almost no evidence of medical or health care costs actually incurred as a result of the May
2012 incident.  While there was some generalized testimony regarding a range of medical "co-pays" associated with
certain doctor visits, depending on their nature, plaintiff produced no evidence of actually having incurred or paid any
specific co-pays.  Similarly, although plaintiff testified to having been prescribed medications, no bills for such
prescriptions, or testimony regarding their cost, was offered. Dr. Nelson, during his testimony, stated that his bills were
not included in the file he was discussing, but a review of Exhibit 11 shows a record of "charges" related to plaintiff of
$3,150.00. Based on Dr. Nelson's testimony regarding bills however, the Court concludes that no bills were issued to
plaintiff, and plaintiff proffered no testimony that he paid Dr. Nelson's bills.  Although it is reasonable to assume
plaintiff incurred medical expenses to the date of trial, the Court cannot speculate as to the amount.

[5]     Plaintiff's five counts are not addressed sequentially.  Rather, the required analysis dictates addressing the
counts in the following order: count IV, count I, count V, count II and count III.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 7

*Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) ("Under general federal maritime law, negligence is an actionable wrong.").  In order to prevail on a claim of maritime negligence,  a plaintiff must prove by a preponderance of the evidence that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) plaintiff suffered actual loss, injury, or damages. *See Frescati Shipping Co.*, 718 F.3d at 207; *Galentine*, 273 F. Supp. 2d at 544; 1 Thomas Schoenbaum, Admiralty and Maritime Law § 5-2 (3d ed. 2001).

In admiralty, a duty of care is derived from (1) duly enacted laws, regulations and rules, (2) custom, or (3) the dictates of reasonableness and prudence.  *Galentine*, 273 F. Supp. 2d at 544. A breach of the applicable duty of care "is the failure to observe the degree of care, precaution, and vigilance which the circumstances demand." *Id.* Maritime negligence is actionable only if it is a legal cause of the plaintiff's injuries – that is, "the negligence must be a 'substantial factor' in causing the injuries." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 214 (5th Cir. 2010); *accord Revak v. Interforest Terminal UMEA AB*, 2009 U.S. Dist. LEXIS 75621, at *16 (E.D. Pa. May 14, 2009) (the inquiry considers not only whether the "event would have occurred in the absence of," but also "whether the damage was a reasonably foreseeable consequence" of, the act or omission).

"Finally, actual economic loss, injury, or  damages suffered by the plaintiff must be specifically demonstrated." *Galentine*, 273 F. Supp.  2d at 544.  Under general maritime law, a plaintiff is entitled to monetary recovery for past wage  losses, lost future wages, past and future medical expenses, pain and suffering and loss of life's  pleasures resulting from an injury caused by negligence.  Admiralty and Maritime Law § 5-16.

1.   <u>Coleman acted negligently</u>

The standard of care in this case derives from the dictates of reasonableness and prudence

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 8

in the particular circumstance. As captain of the Vessel, Coleman owed plaintiff a duty to attend to his comfort and safety, which Coleman breached. *Cf. Evans v. Nantucket Cmty. Sailing, Inc.*, 582 F. Supp. 2d 121, 140 (D. Mass. 2008) ("It is a well established principle of admiralty law that a vessel . . . captain is ultimately responsible for the safety and welfare of his crew."). At trial, Coleman admitted throwing an insulated coffee cup at plaintiff, which ultimately struck plaintiff in the left temple.

2.      Causation and injury

The evidence also supports a finding that Coleman's negligence was the legal cause of some aspects of plaintiff's injury and damages. While Dr. Livingston testified that he found no obvious signs of a physical injury, the photos plaintiff offered indicate that the area of impact was swollen and marked, at least on the night of or the morning after the May 2012 incident. The weight of the medical testimony, however, establishes only a mere possibility that the incident gave rise to all of plaintiff's current symptoms.

Ms. Livingston testified that it was "unclear" as to whether plaintiff's symptoms were the result of multiple cumulative brain injuries. Dr. Jones testified that she does not know the cause of plaintiff's current complaints. While Dr. Nelson attributed plaintiff's abnormal EEG results to the May 2012 incident, he acknowledged prior head injuries could affect those findings. To that end, Dr. Nelson conceded that a prior EEG from which to conduct a differential diagnosis – which he did not have – "would be the ideal situation." Nevertheless, the Court finds plaintiff has proven by a preponderance of the evidence that Coleman's negligence was a "substantial factor" in causing an injury to plaintiff.

**B.      Maritime Lien (Count I)**

Under maritime law, an action in rem is available "only in connection with a maritime lien." *Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 496 (9th Cir. 1991). "Courts have long

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 9

recognized liens in connection with maritime personal injury claims . . . ." *Usher v. M/V Ocean Wave*, 27 F.3d 370, 373 (9th Cir. 1994) (collecting cases). A maritime lien can be "impressed . . . upon"[6] the vessel even though the vessel is not "the instrument by which an injury is inflicted." *The General De Sonis*, 179 F. 123, 126 (W.D. Wash. 1910). A vessel's liability *in rem* in such a situation rests on the principal that a vessel and her crew

> are unified, so far that for maritime torts, whether the ship is the instrument by which an injury is inflicted, or *the injury is the consequence of a negligent . . . act of her captain* . . . , a maritime lien attaches to the ship, which entitles the injured to recover compensation by a suit *in rem*.

*Id.* (emphasis added). Here, the evidence indicates Coleman is liable in negligence. Accordingly, the Vessel is liable *in rem* for Coleman's negligence.

## C.    Vicarious Liability against One Love and Trattner (Count V)

For a party to be held vicariously liable for another party's conduct, a plaintiff must prove the presence of an agency relationship between the defendants.[7] There are generally two types of agents – servants[8] and independent contractors. *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434 (3d Cir. 1994). "The key difference between a servant and an independent contractor is the degree of control the principal exerts over the agent." *King's Choice Neckwear, Inc. v. FedEx Corp.*, 2007 U.S. Dist. LEXIS 93843, at *13 (D.N.J. Dec. 20,

---

[6]      *The China*, 74 U.S. 53, 56 (1868).

[7]      "Federal maritime law embraces general principles of agency." *Adriatic Ship Supply Co. v. M/V Shaula*, 632 F. Supp.1573, 1575 (E.D. Pa. 1986) (citation & footnote omitted); *accord Rannals v. Diamond Jo Casino*, 265 F.3d 442, 455 (6th Cir. 2001) ("The law of agency is fully applicable in admiralty."). Federal courts have adopted the Restatement of Agency in maritime law as an accurate statement of applicable general agency principles. *See, e.g., Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 71-72 (2nd Cir. 2012); *D & M Carriers LLC v. M/V Thor Spirit*, 586 Fed. Appx. 564, 570-71 (11th Cir. 2014); *Perry v. HAL Antillen NV*, 2013 U.S. Dist. LEXIS 68679, at *105 (W.D. Wash. May 14, 2013); *cf. Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 216 (3d Cir. 1993) ("apply[ing] ordinary principles of the law of agency [pursuant to R2d Agency] adjusted by an eye on the peculiarities of maritime life" in determining a servant's employment status).

[8]      *See McCarthy v. Recordex Serv.*, 80 F.3d 842, 853 (3d Cir. 1996) (noting the word "servant" is an "employee in modern day parlance"); *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994) ("Servants generally are employees of the principal"); Restatement (Second) Agency § 220, cmt. g (stating "[i]n general, [employee] is synonymous with servant"); *cf.* Restatement (Third) Agency § 2.04, cmt. a ("This Restatement does not use the terminology of "master" and "servant").

2007).  As explained by the *King* court,

> factors used to determine whether the control is minimal enough to constitute an independent contractor relationship include, *inter alia*, whether the agent worked for other companies at the same time, whether the agent is paid by time worked or by the work performed, whether the agent operates its own independent enterprise, whether the principal has a right of physical control, whether the principal supplied the tools and work location and whether the work is part of the principal's regular course of business.

*Id*.

Here, the evidence shows that while One Love provided the Vessel, (1) it exercised no control over the Vessel's route, (2) the passengers paid Coleman directly for his services and (3) Coleman captained boats for other companies.   Accordingly, the Court finds that Coleman was not a servant but rather an independent contractor.  *See AT&T*, 42 F.3d at 1435 (explaining an actor is an independent contract where a principal "lacks the right to control the time, manner, and method of executing the work").[9]

A determination that Coleman is an independent contractor is not dispositive, however, on the issue of vicarious liability.  A person can be both an independent contractor *and* an agent.  *See AT&T*, 42 F.3d at 1436.  Consequently, in determining vicarious liability, the Court must first determine whether Coleman was an agent-independent contractor or a non-agent independent contractor.  *See id*.  "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."  *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013).

"Vicarious liability due to an agency relationship can be based on the agent's actual authority . . . [or] apparent authority."  *Id*.  "An agent acts with actual authority when, at the time

---

[9]       In his amended complaint, plaintiff alleges that Coleman and Trattner had an "employee-employer or other special relationship."  Am. Compl. ¶ 58.  Plaintiff produced no evidence to support a finding that Coleman served as Trattner's employee or had undertaken a special relationship therewith.  Rather, the evidence indicates that any relationship that could potentially give rise to vicarious liability was between One Love and Coleman and not between Trattner and Coleman.  Further, there was no proof of any "alter ego" relationship between Trattner and One Love.  Accordingly, Trattner cannot be found vicariously liable for the negligent act of Coleman.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 11

of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id*. (quoting Restatement (Third) of Agency § 2.01 (2006)). That is, the  manifestation by the principal to the agent controls.[10]

On the other hand, "[a]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." *Covington*, 710 F.3d at 114 (citation omitted); Restatement (Third) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").[11]  Therefore, in considering apparent authority, manifestation by the principal to the third party controls.

The Court need not resolve this issue, however, because even if Coleman is deemed to be an agent-independent contractor of One Love, vicarious liability will not attach under either authority theory.  Here, the action that caused the injury to plaintiff was  the throwing of the cup by Coleman.  Plaintiff proffered no evidence whatsoever that that action  was either "within the scope of [Coleman's] actual authority," or was "ratified" by anyone.  Nor did plaintiff put on evidence showing it would have been reasonable for any of the passengers to  believe or expect, based on representations or actions of One Love or Trattner directed to them,  that Coleman's

---

[10]    *See* Rst 3d Agency § 7.04 (stating "[a] principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and [] the agent's conduct is tortious . . . '").

[11]    "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."  Rst 3d Agency § 7.08 (2006). "Thus, a principal is not subject to liability when actions that an agent takes with apparent authority, although connected in some way to the agent's tortious conduct, do not themselves constitute the tort or enable the agent to mask its commission." *Id*. comment b; *see AT&T*, 42 F.3d at 1437 ("A principal is not generally liable for physical torts committed by its independent contractor-agent").

*Hargus v.* FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, *et al.*
Civil No. 2013-111
Page 12

tortious conduct – throwing the cup – was undertaken on behalf of his principal.

**D.      Negligence against One Love and Trattner (Count II)**[12]

Plaintiff's allegations of direct negligence against One Love and Trattner fit into several general categories.   First, plaintiff sets forth allegations related to whether the proper and necessary equipment was furnished for the Vessel so as to protect the safety of the passengers.[13] Next, plaintiff alleges a breach of a duty in connection with representations or assurances made to passengers.[14] Third, plaintiff raises allegations with respect to a failure to provide a "competent" captain.[15] Finally, there are allegations related to a failure to properly hire,  supervise and retain a suitable captain.[16]

With respect to allegations related to equipment and representations made to plaintiff, there was a complete lack of proof that there were either equipment issues or problems that led to plaintiff's injury, or that any representations were made to him – or to anyone else – that resulted  in any injury to plaintiff. Similarly, there was no proof of any "hazardous condition" on the Vessel.

With respect to the allegations regarding the negligent hiring and supervision of Coleman, there was likewise a failure of proof that, even if true, these allegations had any causal relation to the injury at issue.  The Restatement (Third) of Agency recognizes the tort of negligent supervision, providing "[a] principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the

---

[12]       Many of the allegations in this Count overlap to a large extent with those set forth in Count III, wherein plaintiff alleges a duty to "inspect, investigate, screen, select and retain."

[13]       *E.g.*, Am. Comp. ¶¶  45(b), (c), (e) [DE 2].

[14]       *E.g., Id.* ¶¶  45(g), (k).

[15]       *E.g., Id.* ¶¶  45(e), (h), (i), (j).

[16]       *E.g., Id.* ¶¶  45(d), (e).

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 13

principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the

agent."  Restatement (Third) Agency § 7.05(1) (2006).  A claim for negligent hiring, retention or

supervision requires evidence of the following:

> (1) the existence of an employment relationship; (2) the employee's
> incompetence; (3) the employer's actual or constructive knowledge of such
> incompetence; (4) the employee's act or omission causing plaintiff's injuries; and
> (5) the employer's negligence in hiring or retaining the employee was the
> proximate cause of the plaintiff's injuries.

*Mala v. Marine Serv. Mgmt.*, 2009 U.S. Dist. LEXIS 61959, at *8 (D.V.I. July 20, 2009)

(quoting *Watson v. City of Cleveland*, 202 Fed. Appx. 844, 857 (6th Cir. 2006) (discussing the

elements under Ohio law)).

Applying these elements to the proofs adduced at trial, the Court cannot find that either

Trattner or One Love is liable to plaintiff under this theory.  As discussed above, there simply is

no evidence of an employment or agency relationship between Coleman and Trattner.[17]  Further,

even if One Love is deemed Coleman's employer for purposes of this analysis, the claim fails.

Even if Trattner, on One Love's behalf, failed to inquire about or discover  Coleman's past driving

or boating record,[18] there is no evidence that anything that could have  been learned was similar

in character to the conduct at issue, or would have  put a person on  notice that such conduct

was at all foreseeable.  As such, plaintiff has not established the requisite causal connection

between the conduct or injury that occurred here, and any failure by  One Love or Trattner to

investigate Coleman prior to hiring him, or to supervise him.

**E.     Negligent Entrustment (Count III)**

Although similar in some respects to the allegations in Count II, plaintiff alleges in Count

III that One Love and Trattner negligently entrusted Coleman with operation of the Vessel.  The

---

[17]        *See, supra*, section II.C.

[18]        Plaintiff in this regard offered no evidence of the temporal proximity of the alleged driving and boating
violations to the conduct at issue in this case.

doctrine of negligent entrustment is embodied in Restatement (Second) of Torts § 390.  Section 390 provides that one who supplies a chattel for another's use whom the supplier  "knows or has reason to know" is likely to use the chattel in a manner "involving unreasonable  risk of physical harm to . . . others" is subject to liability for the physical harm resulting thereto.  Restatement (Second) of Torts § 390; *see Baron by & ex rel. Baron v. Rosario*, 982 F. Supp.  1037, 1039 (D.V.I. 1997).

The evidence demonstrates that plaintiff's injury was unrelated to Coleman's operation of the Vessel.  Accordingly, the Court finds that One Love and Trattner are not liable for negligent entrustment.

**F.     Damages**

Having found Coleman and the Vessel liable, the Court next considers the measure of damages to be awarded.  Apart from recovery for pain and suffering, plaintiff seeks the following: $53,681.90 for past lost wages for the years 2012 through 2014, $573,262.04 for future lost wages, and $296,400.00 for future medical expenses.[19]   In support of the lost wage components, plaintiff and Johanna Harrington, his wife, testified that he has been and is currently unable to work full-time.   With respect to future medical expenses, plaintiff presented the testimony of neurologist Dr. Nelson.   Defendants counter that plaintiff failed to offer evidence "regarding reasonably likely future medical treatment or the cost for such treatment," and to offer "any expert evidence as to [his] alleged economic damages."[20]

---

[19]     Pl.'s Proposed Findings of Fact & Conclusions of Law at ¶¶ 123, 125, 128-29, 131-33, 136 [DE 243].

[20]     Defs.' Am. Proposed Findings of Fact & Conclusions of Law at 14-15 [DE 248]. Expert testimony in support of claims for future losses is not required.  *See, e.g., Maxfield v. Sinclair Int'l*, 766 F.2d 788, 797 (3d Cir. 1985) (finding no expert testimony needed to establish plaintiff's projected earnings and reduce same to present value where "his request for front pay [was based] only upon his former earnings history"); *see also Jerome v. Watersports Adventure Rentals & Equip.*, 2013 U.S. Dist. LEXIS 97146, at *28 (D.V.I. July 11, 2013) (finding "expert economic and vocational testimony are not required to recover lost future earnings in this case").   However, "[d]amages must be supported by the facts established in the record and cannot be speculative." *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 182 (S.D.N.Y. 2013) *aff'd in part, vacated in part on other grounds by* 597 Fed.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 15

1.      *Past Lost Wages*[21]

Plaintiff seeks past lost wages based on his average gross earnings for 2008 through 2011. Any award for past lost earnings, however, must be based on "actual wage losses" and "after-tax calculations or estimates." 1 Admiralty and Maritime Law § 5-16.1. Prior to the May 2012 incident, from 2008 through 2011, plaintiff had an average annual net loss of almost $5,000. In 2012, while employed with V.I. Ecotours, plaintiff's earnings exceeded $10,000, with much of those earnings (more than $6,200) accruing for work performed after the May 2012 incident.

Given plaintiff's historical earnings, and his actual earnings for the balance of 2012 following his injury, plaintiff has not met his burden of demonstrating the necessary causal connection between the incident and his claim for past lost wages, or indeed any quantifiable wage loss.

2.      *Future Lost Wages*

As evidence of a future inability to work full-time, plaintiff's evidence was limited to his and his wife's subjective evaluation of his abilities. Dr. Livingston, however, authorized plaintiff to return to work without any restrictions just two days after the incident. Moreover, none of plaintiff's treating or consulting physicians testified or indicated in their progress notes that plaintiff had any work limitations. There is simply no sufficient evidence of plaintiff's complete inability to work, or of his limitations, to support an award of future wage losses. Accordingly, plaintiff's projections of future income loss are without evidentiary support since they are wholly dependent on an unfounded assumption that plaintiff is incapable of working at

---

Appx. 33 (2d Cir. 2015); *accord Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001) (stating "damages may not be determined by mere speculation or guess . . . ."); Admiralty and Maritime Law § 5-16 ("Concrete evidence must be presented at trial to support each of the claimed items of damage in a particular case").

[21]      Past lost wages "are usually measured by the actual wage losses incurred by the plaintiff to the date of trial." 1 Admiralty and Maritime Law § 5-16.1. Any award for past lost earnings must be based on "after-tax calculations or estimates." *Id.*

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 16

all for the entirety of his working life.[22]

3.     *Future Medical Expenses*

With respect to future medical expenses, plaintiff proffered the testimony of Dr. Nelson, an expert in the fields of neurology and internal medicine.[23]  Dr. Nelson testified that the symptoms plaintiff presented, and on which he based his diagnoses,[24] "tend to resolve over time." Nevertheless, he then offered the opinion that plaintiff must receive certain treatment "indefinitely."

First, based upon three office visits between June 2013 and September 2013, and tests administered during those visits, Dr. Nelson concluded that plaintiff required a more thorough neuropsychological evaluation and "cognitive behavioral therapy" ("CBT") once a week for $100.00 per session.  He also stated, however, that CBT is performed by neuropsychologists, and those specialists must determine the frequency of any necessary CBT.

Next, Dr. Nelson opined that plaintiff would require physical therapy for two months, three times a week, on a yearly basis for an indefinite number of years.  He also testified that "usually" a

---

[22]     In support of this assumption, plaintiff implores the Court to assume plaintiff's work-life expectancy is 26 years.  This figure is based on plaintiff's request that the Court judicially notice a retirement age of 67 – a request the Court denied.  *See* Memorandum and Order, dated April 14, 2015 [DE 231].  A court must take judicial notice of a fact "if requested by a party and supplied with the necessary information."  FED. R. EVID. 201(c)(2).  The noticed fact must be relevant, however, to the issues in the case.  *See* Wright & Miller, 21B Fed. Prac. & Proc. Evid. § 5104 (2d ed.). "The court may take judicial notice at any stage of the proceeding," FED. R. EVID. 201(d), "as long as it is not unfair to a party to do so and does not undermine the [] court's factfinding authority."  *Nantucket Investors II v. California Fed. Bank*, 61 F.3d 197, 205 (3d Cir. 1995).

Even if the Court reconsiders its earlier ruling and judicially notices age 67 as plaintiff's retirement age, plaintiff cannot overcome his failure to offer evidentiary support for his claim that he is incapable of working to age 67 as a result of Coleman's negligence. *See In re Moran Towing Corp.*, 984 F. Supp. 2d at 182 ("Damages must be supported by the facts established in the record and cannot be speculative."); *accord Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001) (stating "damages may not be determined by mere speculation or guess . . . .").

[23]     *See* T2 26, 36-39, 41.

[24]     Dr. Nelson diagnosed plaintiff with post-concussion syndrome, cervical strain and cervical discogenic disease "aggravated" by being struck in the head.  He included neck pain and a pinched nerve in the neck as having been the result of the present incident as well.  The records of Dr. Jones, however, plaintiff's primary care doctor, indicate plaintiff's left should pain has been "ongoing for years," and that he has experienced neck and low back pain for over 20 years.  *See* Exhibit 12.  It is undisputed that plaintiff suffered numerous head injuries, including concussions, throughout his life.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 17

person in plaintiff's position would need physical therapy "periodically," but that the frequency and need would depend on symptoms.

Finally, Dr. Nelson offered that plaintiff should have follow up "reevaluations" with a neurologist "approximately every three months" indefinitely, and it would be "good" to have an annual EEG.

Based on this testimony – including its qualifications and limitations – and the other evidence of record, the Court concludes that there simply is no credible evidence of the permanence of the injury sustained here, as distinguished from plaintiff's history of head injuries generally, and that an award of an amount for future medical expenses necessitated by this injury would be based on little more than speculation or conjecture. *See Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001) (stating "damages may not be determined by mere speculation or guess . . . .").

### III.   CONCLUSIONS OF LAW

1.   Claims such as these for personal injury to the passenger of a vessel caused by the captain of the vessel meet the situs and nexus requirements for admiralty tort jurisdiction of this Court. *Sisson v. Ruby*, 497 U.S. 358 (1990).

2.   The Court has jurisdiction over the parties and subject matter of this case pursuant to 28 § U.S.C. § 1333.

3.   The substantive law applicable in cases of admiralty jurisdiction is federal law. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959).

4.   Coleman is liable for negligence.

5.   The Vessel is liable *in rem.*

6.   One Love is not liable for negligent entrustment or for direct negligence and nor is it vicariously liable for Coleman's negligence.

7.   Trattner is not liable for negligent entrustment or for direct negligence nor is he vicariously liable for Coleman's negligence.

*Hargus v. FEROCIOUS AND IMPETUOUS, LLC d/b/a ONE LOVE CHARTERS, et al.*
Civil No. 2013-111
Page 18

An appropriate judgment follows.

Dated:  September 30, 2015                              S\ _____
                                                       **RUTH MILLER**
                                                       United States Magistrate Judge